## SAXBE, ATTORNEY GENERAL, ET AL. v. WASHINGTON POST CO. ET AL.

No. 73–1265.   Argued April 17, 1974—Decided June 24, 1974

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *ante*, p. 836. POWELL, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 850.

*Solicitor General Bork* argued the cause for petitioners. With him on the brief were *Acting Assistant Attorney General Jaffe, Edmund W. Kitch,* and *Leonard Schaitman.*

*Joseph A. Califano, Jr.,* argued the cause for respondents. With him on the brief were *Charles H. Wilson, Jr.,* and *Richard M. Cooper.**

---

*William H. Allen* filed a brief for the Reporters Committee for Freedom of the Press Legal Defense and Research Fund as *amicus curiae* urging affirmance.

Mr. Justice Stewart delivered the opinion of the Court.

The respondents, a major metropolitan newspaper and one of its reporters, initiated this litigation to challenge the constitutionality of ¶ 4b (6) of Policy Statement 1220.1A of the Federal Bureau of Prisons.[1] At the time that the case was in the District Court and the Court of Appeals, this regulation prohibited any personal interviews between newsmen and individually designated federal prison inmates. The Solicitor General has informed the Court that the regulation was recently amended "to permit press interviews at federal prison institutions that can be characterized as minimum security."[2] The general prohibition of press interviews with inmates remains in effect, however, in three-quarters of the federal prisons, *i. e.*, in all medium security and maximum security institutions, including the two institutions involved in this case.

In March 1972, the respondents requested permission from the petitioners, the officials responsible for administering federal prisons, to conduct several interviews with specific inmates in the prisons at Lewisburg, Pennsylvania, and Danbury, Connecticut. The petitioners denied permission for such interviews on the authority of Policy Statement 1220.1A. The respondents thereupon commenced this suit to challenge these denials and the regulation on which they were predicated. Their essential contention was that the prohibition of all press interviews

---

[1] "Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, conversation may be permitted with inmates whose identity is not to be made public, if it is limited to the discussion of institutional facilities, programs and activities."

[2] Letter of Apr. 16, 1974, to Clerk, Supreme Court of the United States, presently on file with the Clerk.

with prison inmates abridges the protection that the First Amendment accords the newsgathering activity of a free press. The District Court agreed with this contention and held that the Policy Statement, insofar as it totally prohibited all press interviews at the institutions involved, violated the First Amendment. Although the court acknowledged that institutional considerations could justify the prohibition of some press-inmate interviews, the District Court ordered the petitioners to cease enforcing the blanket prohibition of all such interviews and, pending modification of the Policy Statement, to consider interview requests on an individual basis and "to withhold permission to interview . . . only where demonstrable administrative or disciplinary considerations dominate." 357 F. Supp. 770, 775 (DC 1972).

The petitioners appealed the District Court's judgment to the Court of Appeals for the District of Columbia Circuit. We stayed the District Court's order pending the completion of that appeal, *sub nom. Kleindienst* v. *Washington Post Co.,* 406 U. S. 912 (1972). The first time this case was before it, the Court of Appeals remanded it to the District Court for additional findings of fact and particularly for reconsideration in light of this Court's intervening decision in *Branzburg* v. *Hayes,* 408 U. S. 665 (1972). 155 U. S. App. D. C. 283, 477 F. 2d 1168 (1972). On remand, the District Court conducted further evidentiary hearings, supplemented its findings of fact, and reconsidered its conclusions of law in light of *Branzburg* and other recent decisions that were urged upon it. In due course, the court reaffirmed its original decision, 357 F. Supp. 779 (DC 1972), and the petitioners again appealed to the Court of Appeals.

The Court of Appeals affirmed the judgment of the District Court. It held that press interviews with prison inmates could not be totally prohibited as the Policy

Statement purported to do, but may "be denied only where it is the judgment of the administrator directly concerned, based on either the demonstrated behavior of the inmate, or special conditions existing at the institution at the time the interview is requested, or both, that the interview presents a serious risk of administrative or disciplinary problems." 161 U. S. App. D. C. 75, 87–88, 494 F. 2d 994, 1006–1007 (1974). Any blanket prohibition of such face-to-face interviews was held to abridge the First Amendment's protection of press freedom. Because of the important constitutional question involved, and because of an apparent conflict in approach to the question between the District of Columbia Circuit and the Ninth Circuit,[3] we granted certiorari. 415 U. S. 956 (1974).

The policies of the Federal Bureau of Prisons regarding visitations to prison inmates do not differ significantly from the California policies considered in *Pell* v. *Procunier, ante,* p. 817. As the Court of Appeals noted, "inmates' families, their attorneys, and religious counsel are accorded liberal visitation privileges. Even friends of inmates are allowed to visit, although their privileges appear to be somewhat more limited." 161 U. S. App. D. C., at 78, 494 F. 2d, at 997. Other than members of these limited groups with personal and professional ties to the inmates, members of the general public are not permitted under the Bureau's policy to enter the prisons and interview consenting inmates. This policy is applied with an even hand to all prospective visitors, including newsmen, who, like other members of the public, may enter the prisons to visit friends or family members. But, again like members of the general public, they may not enter

---

[3] See *Seattle-Tacoma Newspaper Guild* v. *Parker,* 480 F. 2d 1062, 1066–1067 (1973). See also *Hillery* v. *Procunier,* 364 F. Supp. 196, 199–200 (ND Cal. 1973).

the prison and insist on visiting an inmate with whom they have no such relationship. There is no indication on this record that Policy Statement 1220.1A has been interpreted or applied to prohibit a person, who is otherwise eligible to visit and interview an inmate, from doing so merely because he is a member of the press.[4]

Except for the limitation in Policy Statement 1220.1A on face-to-face press-inmate interviews, members of the press are accorded substantial access to the federal prisons in order to observe and report the conditions they find there. Indeed, journalists are given access to the prisons and to prison inmates that in significant respects exceeds that afforded to members of the general public. For example, Policy Statement 1220.1A permits press representatives to tour the prisons and to photograph any prison facilities.[5] During such tours a newsman is permitted to conduct brief interviews with any inmates he might encounter.[6] In addition, newsmen and inmates are permitted virtually unlimited written correspondence with each other.[7] Outgoing correspondence from inmates to press representatives is neither censored nor inspected. Incoming mail from press representatives is inspected only for contraband or statements inciting illegal action. Moreover, prison officials are available to the press and are required by Policy Statement 1220.1A to "give all possible assistance" to press representatives "in providing

---

[4] The Solicitor General's brief represents that "[m]embers of the press, like the public generally, may visit the prison to see friends there." Presumably, the same is true with respect to family members. The respondents have not disputed this representation.

[5] Policy Statement 1220.1A ¶¶ 4b (5) and (7).

[6] See *id.*, ¶ 4b (6) set out in n. 1, *supra*. The newsman is requested not to reveal the identity of the inmate, and the conversation is to be limited to institutional facilities, programs, and activities.

[7] *Id.*, ¶¶ 4b (1) and (2).

background and a specific report" concerning any inmate complaints.[8]

The respondents have also conceded in their brief that Policy Statement 1220.1A "has been interpreted by the Bureau to permit a newsman to interview a randomly selected group of inmates." As a result, the reporter respondent in this case was permitted to interview a randomly selected group of inmates at the Lewisburg prison. Finally, in light of the constant turnover in the prison population, it is clear that there is always a large group of recently released prisoners who are available to both the press and the general public as a source of information about conditions in the federal prisons.[9]

Thus, it is clear that Policy Statement 1220.1A is not part of any attempt by the Federal Bureau of Prisons to conceal from the public the conditions prevailing in federal prisons. This limitation on prearranged press interviews with individually designated inmates was motivated by the same disciplinary and administrative considerations that underlie § 115.071 of the California Department of Corrections Manual, which we considered in *Pell* v. *Procunier* and *Procunier* v. *Hillery, ante,* p. 817. The experience of the Bureau accords with that of the California Department of Corrections and suggests that the interest of the press is often "concentrated on a relatively small number of inmates who, as a result, [become] virtual 'public figures' within the prison society and gai[n] a disproportionate degree of notoriety and influence among their fellow inmates." *Pell, ante,* at 831–832. As a result those inmates who are conspicuously publicized because of

---

[8] *Id.,* ¶ 4b (12).

[9] The Solicitor General's brief informs us that "approximately one-half of the prison population on any one day will be released within the following 12 months. The average population is 23,000, of whom approximately 12,000 are released each year."

their repeated contacts with the press tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison.

The District Court and the Court of Appeals sought to meet this problem by decreeing a selective policy whereby prison officials could deny interviews likely to lead to disciplinary problems. In the expert judgment of the petitioners, however, such a selective policy would spawn serious discipline and morale problems of its own by engendering hostility and resentment among inmates who were refused interview privileges granted to their fellows. The Director of the Bureau testified that "one of the very basic tenets of sound correctional administration" is "to treat all inmates incarcerated in [the] institutions, as far as possible, equally." This expert and professional judgment is, of course, entitled to great deference.

In this case, however, it is unnecessary to engage in any delicate balancing of such penal considerations against the legitimate demands of the First Amendment. For it is apparent that the sole limitation imposed on newsgathering by Policy Statement 1220.1A is no more than a particularized application of the general rule that nobody may enter the prison and designate an inmate whom he would like to visit, unless the prospective visitor is a lawyer, clergyman, relative, or friend of that inmate. This limitation on visitations is justified by what the Court of Appeals acknowledged as "the truism that prisons are institutions where public access is generally limited." 161 U. S. App. D. C., at 80, 494 F. 2d, at 999. See *Adderley* v. *Florida,* 385 U. S. 39, 41 (1966). In this regard, the Bureau of Prisons visitation policy does not place the press in any less advantageous position than the public generally. Indeed, the total access to federal prisons and prison inmates that the Bureau of Prisons accords to the press far surpasses that available to other members of the public.

We find this case constitutionally indistinguishable from *Pell* v. *Procunier, ante,* p. 817, and thus fully controlled by the holding in that case. "[N]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Id.,* at 834. The proposition "that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally . . . finds no support in the words of the Constitution or in any decision of this Court." *Id.,* at 834–835. Thus, since Policy Statement 1220.1A "does not deny the press access to sources of information available to members of the general public," *id.,* at 835, we hold that it does not abridge the freedom that the First Amendment guarantees. Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

[For dissenting opinion of MR. JUSTICE DOUGLAS, see *ante,* p. 836.]

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Court today upholds the authority of the Bureau of Prisons to promulgate and enforce an absolute ban against personal interviews of prison inmates by representatives of the news media.[1] In my view the interview ban impermissibly burdens First Amendment freedoms. My analysis proceeds as follows. Part I addresses the nature and effect of the Bureau's policy.

---

[1] Throughout this opinion I use the terms "news media" and "press" to refer generally to both print and broadcast journalism. Of course, the use of television equipment in prisons presents special problems that are not before the Court in this case.

Part II concerns the constitutional underpinnings of respondents' attack on that policy. Part III considers the Bureau's justifications for an absolute interview ban in light of the appropriate standard of First Amendment review, and Part IV surveys some of the factors that the Bureau may consider in formulating a constitutionally acceptable interview policy. Part V contains some concluding remarks.

I

The ban against press interviews is not part of any general news blackout in the federal prisons. Bureau of Prisons Policy Statement 1220.1A establishes the official policy regarding prisoner-press communications, and that policy in many respects commendably facilitates public dissemination of information about federal penal institutions. Inmate letters addressed to members of the news media are neither opened nor censored, and incoming mail from press representatives is inspected only for contraband and for content likely to incite illegal conduct. Furthermore, the Bureau officially encourages newsmen to visit federal prisons in order to report on correctional facilities and programs.

The specific issue in this case is the constitutionality of the Bureau's ban against prisoner-press interviews. That policy is set forth in ¶ 4b (6) of the Policy Statement:

> "Press representatives will not be permitted to interview individual inmates. This rule shall apply even where the inmate requests or seeks an interview. However, a conversation may be permitted with inmates whose identity is not to be made public, if it is limited to the discussion of institutional facilities, programs and activities."

The Policy Statement does not explicate the distinction between an "interview" and a "conversation," but that subject was explored in evidentiary proceedings before the

District Court. The court found that a "conversation" generally occurs when a newsman is taking a supervised tour of an institution and stops to ask an inmate about prison conditions and the like. It is a brief, spontaneous discussion with a randomly encountered inmate on subjects limited to "institutional facilities, programs, and activities." An "interview," by contrast, is a prearranged private meeting with a specifically designated inmate. It is unrestricted as to subject matter and lasts a sufficient time to permit full discussion.[2]

The Bureau's prohibition against press interviews is absolute in nature. It applies without regard to the record and characteristics of the particular inmate involved, the purpose of the interview, or the conditions then prevailing at the institution in question. At the time of the decisions of the District Court and the Court of Appeals, the interview ban applied with equal rigor to every correctional facility administered by the Bureau, community treatment centers as well as major penitentiaries. By letter dated April 16, 1974, the Solicitor General informed us that the Bureau subsequently modified its policy to exempt minimum security facilities from the absolute prohibition of press interviews. This change affects approximately one-quarter of the inmate population of the federal prisons. For the remainder, the Bureau intends to continue its established policy.

In its order remanding the case for reconsideration in light of *Branzburg* v. *Hayes,* 408 U. S. 665 (1972), the Court of Appeals directed the District Court to determine

---

[2] In at least two instances, federal wardens have permitted newsmen to interview randomly selected groups of inmates. Apparently, such occurrences are not widespread, and the basis for them is unclear. Neither in express terms nor by implication does the Policy Statement authorize such group interviews, and the Government does not suggest that the Bureau of Prisons officially approves the practice.

the "extent to which the accurate and effective reporting of news has a critical dependence upon the opportunity for private personal interviews." 155 U. S. App. D. C. 283, 284, 477 F. 2d 1168, 1169 (1972). The District Court held an evidentiary hearing on this subject and made specific findings of fact. 357 F. Supp. 779 (DC 1972). Thanks to this special effort by the Court of Appeals and the District Court, we have an unusually detailed and informative account of the effect of the interview ban on prisoner-press communications.[3]

The District Court received testimony on this point from six knowledgeable persons.[4] All agreed that personal interviews are crucial to effective reporting in the prison context. A newsman depends on interviews in much the same way that a trial attorney relies on cross-

---

[3] Writing for the Court of Appeals, Judge McGowan attributed this special care to develop an unusually enlightening evidentiary record to the "great respect which the federal judiciary entertains for the Bureau by reason of its long and continuous history of distinguished and enlightened leadership . . . ." 161 U. S. App. D. C. 75, 77, 494 F. 2d 994, 996. This is a sentiment which I fully share, for the Bureau has long been a constructive leader in prison reform.

[4] The court received testimony from three experienced reporters, two academic journalists, and an attorney with special expertise in this area. The reporters were respondent Ben H. Bagdikian, a Washington Post reporter experienced in covering prisons and interviewing inmates; Timothy Leland, a Pulitzer prize winner who is Assistant Managing Editor of the Boston Globe and head of its investigative reporting team; and John W. Machacek, a reporter for the Rochester Times-Union, who won a Pulitzer prize for his coverage of the Attica Prison riot. The academic journalists were Elie Abel, Dean of the Graduate School of Journalism of Columbia University, and Roy M. Fisher, Dean of the School of Journalism of the University of Missouri and former editor of the Chicago Daily News. The sixth witness was Arthur L. Liman, an attorney who served as general counsel to the New York State Special Commission on Attica. In that capacity he supervised an investigation involving 1,600 inmate interviews, at least 75 of which he conducted personally.

examination. Only in face-to-face discussion can a reporter put a question to an inmate and respond to his answer with an immediate follow-up question. Only in an interview can the reporter pursue a particular line of inquiry to a satisfactory resolution or confront an inmate with discrepancies or apparent inconsistencies in his story. Without a personal interview a reporter is often at a loss to determine the honesty of his informant or the accuracy of the information received.[5] This is particularly true in the prison environment, where the sources of information are unlikely to be well known to newsmen or to have established any independent basis for assessing credibility. Consequently, ethical newsmen are reluctant to publish a story without an opportunity through face-to-face discussion to evaluate the veracity and reliability of its source. Those who do publish without interviews are likely to print inaccurate, incomplete, and sometimes jaundiced news items. The detailed testimony on this point led the District Court to find as a fact that the absolute interview ban precludes accurate and effective reporting on prison conditions and inmate grievances.

The District Court also found that the alternative avenues of prisoner-press communication allowed by the Policy Statement, whether considered singly or in aggregation, are insufficient to compensate for the prohibition of personal interviews. For the reasons stated above, correspondence is decidedly inferior to face-to-face discussion as a means of obtaining reliable information about prison conditions and inmate grievances. In addition, the prevalence of functional illiteracy among the inmate population poses a serious difficulty; many prison-

---

[5] Both Dean Abel and Dean Fisher testified that the personal interview is so indispensable to effective reporting that the development of interviewing techniques occupies a central place in the curricula of professional journalism schools.

ers are simply incapable of communicating effectively in writing.

Random conversations during supervised tours of prison facilities are also no substitute for personal interviews with designated inmates. The conversations allowed by the Policy Statement are restricted in both duration and permissible subject matter. Furthermore, not every inmate is equally qualified to speak on every subject. If a reporter is investigating a particular incident, the opportunity to converse with inmates who were not present is of little consequence. Moreover, the conversations associated with guided tours are often held in the presence of several inmates, a factor likely to result in distortion of the information obtained.[6] The District Court received

---

[6] In recounting his experience as general counsel to the New York State Special Commission on Attica, Arthur L. Liman gave the following testimony:

"We found that in the group interviews the inmates tended to give us rhetoric, rather than facts; and that . . . in the interest of showing solidarity, inmates were making speeches to us rather than confiding what I knew in many cases to be the fact.

"I should add that the basic problem in conducting interviews at a prison is that it is a society in which inmates face sanctions and rewards not just from the administration but from other inmates; and that when an inmate sees you in private, he will tell you things about the administration that may not only be unfavorable but may in many cases be favorable. I found that when we saw them in group, there was a tendency to say nothing favorable about the administration and instead simply to make a speech about how horrible conditions were. In fact, many of the inmates who would say this in group would say something different when they were seen alone." 1 App. 290–291.

"There is something which is not stressed in our description of conditions because we found it not to be a major factor at Attica, and that is the question or the issue of physical brutality toward inmates. The press, before this investigation, had played that up as the major grievance at Attica. We found, when we talked to inmates privately, that the incidence of physical confrontation between offi-

detailed testimony concerning the kinds of information that can only be obtained through personal interviews of individual inmates.

On the basis of this and other evidence, the District Court found that personal interviews are essential to accurate and effective reporting in the prison environment. The Court of Appeals endorsed that conclusion, noting that the trial court's findings of fact on this issue "are supported by a substantial body of evidence of record, and indeed appear to be uncontradicted." 161 U. S. App. D. C., at 82, 494 F. 2d, at 1001. The Government does not seriously attack this conclusion. Instead, it contends that the effect of the Bureau's interview ban on prisoner-press communications raises no claim of constitutional dimensions. It is to that question that I now turn.

## II

Respondents assert a constitutional right to gather news. In the language of the Court of Appeals, they claim a right of access by the press to newsworthy events. However characterized, the gist of the argument is that the constitutional guarantee of a free press may be rendered ineffective by excessive restraints on access to information and therefore that the Government may not enforce such restrictions absent some substantial justification for doing so. In other words, respondents contend that the First Amendment protects both the dissemination of news and the antecedent activity of obtaining the information that becomes news.

The Court rejects this claim on the ground that "newsmen have no constitutional right of access to prisons or

---

cers and inmates was rather limited, and that the real grievance was not about those incidents, but rather about what they would feel was a form of psychic repression, depriving people of their manhood. Therefore, I think a lot of the myth about physical beatings was dispelled." *Id.,* at 292.

their inmates beyond that afforded the general public."
*Pell* v. *Procunier, ante,* at 834. It is said that First
Amendment protections for newsgathering by the press
reach only so far as the opportunities available for the
ordinary citizen to have access to the source of news.
Because the Bureau of Prisons does not specifically dis-
criminate against the news media, its absolute prohibition
of prisoner-press interviews is not susceptible to constitu-
tional attack. In the Court's view, this is true despite the
factual showing that the interview ban precludes effec-
tive reporting on prison conditions and inmate grievances.
From all that appears in the Court's opinion, one would
think that any governmental restriction on access to infor-
mation, no matter how severe, would be constitutionally
acceptable to the majority so long as it does not single
out the media for special disabilities not applicable to the
public at large.

I agree, of course, that neither any news organization
nor reporters as individuals have constitutional rights
superior to those enjoyed by ordinary citizens. The
guarantees of the First Amendment broadly secure the
rights of every citizen; they do not create special privi-
leges for particular groups or individuals. For me, at
least, it is clear that persons who become journalists ac-
quire thereby no special immunity from governmental
regulation. To this extent I agree with the majority.
But I cannot follow the Court in concluding that *any*
governmental restriction on press access to information,
so long as it is nondiscriminatory, falls outside the pur-
view of First Amendment concern.

The Court principally relies on two precedents. In
*Zemel* v. *Rusk,* 381 U. S. 1 (1965), the Court rejected a
United States citizen's contention that he had a First
Amendment right to visit Cuba in order to inform him-
self of the conditions there. The more recent authority
is *Branzburg* v. *Hayes,* 408 U. S. 665 (1972), where we

considered the assertion by newsmen of a qualified First Amendment right to refuse to reveal their confidential sources or the information obtained from them to grand juries. The Court rejected this claim, primarily on the ground that the largely speculative public interest "in possible future news about crime from undisclosed, unverified sources" could not override the competing interest "in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future." *Id.*, at 695.

Relying on these precedents, the majority apparently concludes that nondiscriminatory restrictions on press access to information are constitutionally irrelevant. Neither *Zemel* nor *Branzburg* warrants so broad a reading. In *Zemel* the Court rejected the asserted First Amendment right to visit Cuba on the ground that the governmental restriction on trips to that country was "an inhibition of action" rather than a restraint of speech. 381 U. S., at 16. However appropriate to the context of that case, this distinction could not have been intended as an all-embracing test for determining which governmental regulations implicate First Amendment freedoms and which do not. The decision in *United States* v. *O'Brien*, 391 U. S. 367 (1968), is sufficient answer to any such suggestion. Moreover, the dichotomy between speech and action, while often helpful to analysis, is too uncertain to serve as the dispositive factor in charting the outer boundaries of First Amendment concerns. In the instant case, for example, it may be said with equal facility that the Bureau forbids the *conduct,* at least by newsmen and the public generally, of holding a private meeting with an incarcerated individual or, alternatively, that the Bureau prohibits the direct exchange of *speech* that constitutes an interview with a press representative. In light of the Bureau's willingness to allow lawyers, clergymen, relatives, and friends to meet privately with

designated inmates, the latter characterization of the interview ban seems closer to the mark, but in my view the scope and meaning of First Amendment guarantees do not hinge on these semantic distinctions. The reality of the situation is the same, certainly in this case, and there is no magic in choosing one characterization rather than the other. Simply stated, the distinction that formed the basis for decision in *Zemel* is not helpful here.

Nor does *Branzburg* v. *Hayes, supra,* compel the majority's resolution of this case. It is true, of course, that the *Branzburg* decision rejected an argument grounded in the assertion of a First Amendment right to gather news and that the opinion contains language which, when read in isolation, may be read to support the majority's view. *E. g.,* 408 U. S., at 684–685. Taken in its entirety, however, *Branzburg* does not endorse so sweeping a rejection of First Amendment challenges to restraints on access to news. The Court did not hold that the government is wholly free to restrict press access to newsworthy information. To the contrary, we recognized explicitly that the constitutional guarantee of freedom of the press does extend to some of the antecedent activities that make the right to publish meaningful: "Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.,* at 681. We later reiterated this point by noting that "news gathering is not without its First Amendment protections . . . ." *Id.,* at 707. And I emphasized the limited nature of the *Branzburg* holding in my concurring opinion: "The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Id.,* at 709. In addition to these explicit statements, a fair reading of the majority's analysis in *Branzburg* makes plain that the result hinged

on an assessment of the competing societal interests involved in that case rather than on any determination that First Amendment freedoms were not implicated. See especially *id.*, at 700–701.

In sum, neither *Zemel* nor *Branzburg* presents a barrier to independent consideration of respondents' constitutional attack on the interview ban. Those precedents arose in contexts far removed from that of the instant case, and in my view neither controls here. To the extent that *Zemel* and *Branzburg* speak to the issue before us, they reflect no more than a sensible disinclination to follow the right-to-access argument as far as dry logic might extend. As the Court observed in *Zemel:* "There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow." 381 U. S., at 16–17. It goes too far to suggest that the government must justify under the stringent standards of First Amendment review every regulation that might affect in some tangential way the availability of information to the news media. But to my mind it is equally impermissible to conclude that no governmental inhibition of press access to newsworthy information warrants constitutional scrutiny. At some point official restraints on access to news sources, even though not directed solely at the press, may so undermine the function of the First Amendment that it is both appropriate and necessary to require the government to justify such regulations in terms more compelling than discretionary authority and administrative convenience. It is worth repeating our admonition in *Branzburg* that "without some protection for seeking out the news, freedom of the press could be eviscerated." 408 U. S., at 681.

The specific issue here is whether the Bureau's prohibition of prisoner-press interviews gives rise to a claim of constitutional dimensions. The interview ban is categorical in nature. Its consequence is to preclude accurate

and effective reporting on prison conditions and inmate grievances. These subjects are not privileged or confidential. The Government has no legitimate interest in preventing newsmen from obtaining the information that they may learn through personal interviews or from reporting their findings to the public. Quite to the contrary, federal prisons are public institutions. The administration of these institutions, the effectiveness of their rehabilitative programs, the conditions of confinement that they maintain, and the experiences of the individuals incarcerated therein are all matters of legitimate societal interest and concern.[7] Respondents do not assert a right to force disclosure of confidential information or to invade in any way the decisionmaking processes of governmental officials. Neither do they seek to question any inmate who does not wish to be interviewed. They only seek to be free of an exceptionless prohibition against a method of newsgathering that is essential to effective reporting in the prison context.

I believe that this sweeping prohibition of prisoner-press interviews substantially impairs a core value of the First Amendment. Some years ago, Professor Chafee

---

[7] The history of our prisons is in large measure a chronicle of public indifference and neglect. THE CHIEF JUSTICE, who has provided enlightening leadership on the subject, has spoken out frequently against the ignorance and apathy that characterizes our Nation's approach to the problems of our prisons:

"Yet in spite of all this development of the step-by-step details in the criminal adversary process, we continue, at the termination of that process, to brush under the rug the problems of those who are found guilty and subject to criminal sentence. In a very immature way, we seem to want to remove the problem from public consciousness.

"It is a melancholy truth that it has taken the tragic prison outbreaks of the past three years to focus widespread public attention on this problem." Burger, Our Options Are Limited, 18 Vill. L. Rev. 165, 167 (1972). See W. Burger, For Whom the Bell Tolls, reprinted at 25 Record of N. Y. C. B. A. (Supp.) 14, 18, 23–24 (1970).

pointed out that the guarantee of freedom of speech and press protects two kinds of interests: "There is an individual interest, the need of many men to express their opinions on matters vital to them if life is to be worth living, and a social interest in the attainment of truth, so that the country may not only adopt the wisest course of action but carry it out in the wisest way." Z. Chafee, Free Speech in the United States 33 (1954). In its usual application—as a bar to governmental restraints on speech or publication—the First Amendment protects important values of individual expression and personal self-fulfillment. But where as here, the Government imposes neither a penalty on speech nor any sanction against publication, these individualistic values of the First Amendment are not directly implicated.

What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs. No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny. As the Solicitor General made the point, "[t]he First Amendment is one of the vital bulwarks of our national commitment to intelligent self-government." Brief for Petitioners 47–48. It embodies our Nation's commitment to popular self-determination and our abiding faith that the surest course for developing sound national policy lies in a free exchange of views on public issues.[8] And public debate must not

---

[8] Indeed, Professor Meiklejohn identified this aspect of the First Amendment as its paramount value:

"Just so far as, at any point; the citizens who are to decide an issue are denied acquaintance with information or opinion or doubt or disbelief or criticism which is relevant to that issue, just so far the result must be ill-considered, ill-balanced planning for the general good. *It is that mutilation of the thinking process of the community against which the First Amendment to the Constitution is di-*

only be unfettered; it must also be informed. For that reason this Court has repeatedly stated that First Amendment concerns encompass the receipt of information and ideas as well as the right of free expression. *Kleindienst* v. *Mandel,* 408 U. S. 753, 762 (1972); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 390 (1969); *Lamont* v. *Postmaster General,* 381 U. S. 301 (1965); *Martin* v. *City of Struthers,* 319 U. S. 141, 143 (1943).

In my view this reasoning also underlies our recognition in *Branzburg* that "news gathering is not without its First Amendment protections . . . ." 408 U. S., at 707. An informed public depends on accurate and effective reporting by the news media. No individual can obtain for himself the information needed for the intelligent discharge of his political responsibilities. For most citizens the prospect of personal familiarity with newsworthy events is hopelessly unrealistic. In seeking out the news the press therefore acts as an agent of the public at large. It is the means by which the people receive that free flow of information and ideas essential to intelligent self-government. By enabling the public to assert meaningful control over the political process, the press performs a crucial function in effecting the societal purpose of the First Amendment. That function is recognized by specific reference to the press in the text of the Amendment and by the precedents of this Court:

> "The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs. Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the

*rected.* The principle of the freedom of speech springs from the necessities of the program of self-government." A. Meiklejohn, Free Speech 26 (1948) (emphasis in original).

people responsible to all the people whom they were selected to serve." *Mills* v. *Alabama,* 384 U. S. 214, 219 (1966).

This constitutionally established role of the news media is directly implicated here. For good reasons, unrestrained public access is not permitted. The people must therefore depend on the press for information concerning public institutions. The Bureau's absolute prohibition of prisoner-press interviews negates the ability of the press to discharge that function and thereby substantially impairs the right of the people to a free flow of information and ideas on the conduct of their Government. The underlying right is the right of the public generally. The press is the necessary representative of the public's interest in this context and the instrumentality which effects the public's right. I therefore conclude that the Bureau's ban against personal interviews must be put to the test of First Amendment review.

### III

Because I believe that the ban against prisoner-press interviews significantly impinges on First Amendment freedoms, I must consider whether the Government has met its heavy burden of justification for that policy. In *Tinker* v. *Des Moines School District,* 393 U. S. 503 (1969), the Court noted that First Amendment guarantees must be "applied in light of the special characteristics of the . . . environment." *Id.,* at 506. Earlier this Term we had occasion to consider the applicability of those guarantees in light of the special characteristics of the prison environment. That opportunity arose in *Procunier* v. *Martinez,* 416 U. S. 396 (1974), where we considered the constitutionality of California prison regulations authorizing censorship of inmate correspondence. We declined to analyze that case in terms of "prisoners'

rights," for we concluded that censorship of prisoner mail, whether incoming or outgoing, impinges on the interest in communication of both the inmate and the nonprisoner correspondent: "Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." *Id.*, at 408. We therefore looked for guidance "not to cases involving questions of 'prisoners' rights,' but to decisions of this Court dealing with the general problem of incidental restrictions on First Amendment liberties imposed in furtherance of legitimate governmental activities." *Id.*, at 409. Adopting the approach followed in *Tinker, supra; Healy* v. *James,* 408 U. S. 169 (1972); and *United States* v. *O'Brien,* 391 U. S. 367 (1968), we enunciated the following standard for determining the constitutionality of prison regulations that limit the First Amendment liberties of nonprisoners:

> "First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. . . . Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U. S., at 413.

We announced *Procunier* v. *Martinez, supra,* after final decision of this case by the District Court and affirmance by the Court of Appeals. Happily, those courts anticipated our holding in *Procunier* and decided this case under a standard of First Amendment review that is in substance identical to our formulation there. Thus, the Court of Appeals sought to assure that the impairment of the public's right to a free flow of information about prisons is "no greater than is necessary for the protection of the legitimate societal interests in the effective admin-

istration of [penal] systems." 161 U. S. App. D. C., at 80, 494 F. 2d, at 999.[9] The court reviewed in detail the various interests asserted by the Bureau and reached the following conclusion:

"[W]hile we do not question that the concerns voiced by the Bureau are legitimate interests that merit protection, we must agree with the District Court that they do not, individually or in total, justify the sweeping absolute ban that the Bureau has chosen to impose. When regulating an area in which First Amendment interests are involved, administrative officials must be careful not only to assure that they are responding to legitimate interests which are within their powers to protect; they must also take care not to cast regulations in a broad manner that unnecessarily sacrifices First Amendment rights. In this case the scope of the interview ban is excessive; the Bureau's interests can and must be protected on a more selective basis." *Id.*, at 86, 494 F. 2d, at 1005.

I agree with this conclusion by the Court of Appeals. The Bureau's principal justification for its interview ban has become known during the course of this litigation as the "big wheel" phenomenon. The phrase refers generally to inmate leaders. The Bureau argues that press interviews with "big wheels" increase their status and influence and thus enhance their ability to persuade other prisoners to engage in disruptive behavior. As a result security is threatened, discipline impaired, and meaningful rehabilitation rendered more problematical than ever.

There seems to be little question that "big wheels" do

---

[9] The District Court framed this standard in question form: "In short, are the limitations placed on First Amendment freedoms no greater than is necessary to protect the governmental interests asserted?" 357 F. Supp. 770, 773.

exist [10] and that their capacity to influence their fellow inmates may have a negative impact on the correctional environment of penal institutions. Whether press inter-

[10] The following excerpt from the examination of Hans W. Mattick, Professor of Criminal Justice and Director of the Center for Research in Criminal Justice at the University of Illinois, explains the bases for inmate leadership:

"Q . What are the particular talents or factors that would lead inmates to look upon particular persons among them as leaders?

"A Well, it would depend in part on the native talents of the person, whether he was reasonably articulate, whether he has reasonable social skills. But that wouldn't be sufficient.

"He would also have to have some significant position in the prison, whether that would be the clerk of a cellhouse or whether that would be the assistant to a shop foreman or whether he would be a person who was a porter or a runner, which looks like a low status position to outsiders, but which position has great mobility and therefore you can become a message sender and a message carrier, or persons who work in areas that give them access to goods in what is essentially a scarcity economy.

"So people who work in the kitchens or bakery or where other scarce supplies are and therefore can distribute them illegitimately or serve other purposes of that kind, they tend to have leadership.

"Q Does the fact that an inmate is well known outside of prison tend to make him a leader within a prison among the inmates within the prison?

"A It depends a great deal on the circumstances; that is, for instance, notoriety by itself can't bestow leadership.

"For instance, Sirhan Sirhan, for example, or Richard Speck are simply notorious and that doesn't bestow leadership qualities on them. Or someone like Al Capone, for example, may have had great status outside of the prison, but when he was in prison, he became the object of revenge and attacks by persons who wanted to settle old scores, because it was felt that he couldn't implement enough power to retaliate in turn.

"On the other hand, there were persons, confidence men or spectacular burglars or armed robbers with big scores or something of that kind, where their reputation precedes them and follows them into prison, and that then is combined, and also with certain talents and social skill and articulateness, and if it also looks as though they

views play a significant role in the creation of "big wheels" or in the enhancement of their prestige was a subject of dispute in the District 'Court. With appropriate regard for the expertise of prison administrators, that court found that the problems associated with the "big wheel" phenomenon "are all real considerations and while somewhat impressionistic, they are supported by experience and advanced in good faith." 357 F. Supp. 770, 774.

The District Court also found, however, that the "big wheel" theory does not justify the Bureau's categorical prohibition of all press interviews, and the Court of Appeals endorsed this conclusion. The rationale applies only to those individuals with both disruptive proclivities and leadership potential. The record reveals estimates of the number of prison troublemakers ranging from five to ten percent. Logically, the number of prisoners in this category who have significant influence in the inmate community should constitute a substantially smaller percentage. To the extent that the "big wheel" phenomenon includes influential inmates who generally cooperate in maintaining institutional order, it is not a problem at all. Publicity which enhances *their* prestige is certainly no hindrance to effective penal administration. Moreover, the Bureau has not shown that it is unable to identify disruptive "big wheels" and to take precautions specifically designed to prevent the adverse effects of media attention to such inmates. In short, the remedy of no interview of any inmate is broader than is necessary to avoid the concededly real problems of the "big wheel" phenomenon.[11]

---

have a future in the free community, either in the illegitimate world or the legitimate world, that can play a part in the phenomenon that we call leadership." 2 App. 580–581.

[11] The other considerations advanced by the Bureau do not justify an absolute interview ban but only indicate the difficulties of case-

This conclusion is supported by detailed evidence and by the successful experience of other prison systems in allowing prisoner-press interviews. In connection with this litigation, counsel for respondents attempted to ascertain the interview policies followed by prison administrators in every State and in numerous local jurisdictions. The District Court received into evidence only those policy statements that had been adopted in written form. Of the 24 American jurisdictions in this sample, only five broadly prohibit personal interviews of prison inmates by media representatives.[12]   Seven jurisdictions vest in correctional officials the authority to allow or deny such interviews on a case-by-case basis,[13] and 11 generally permit prisoner-press interviews.[14]   Thus, correctional authorities in a substantial majority of the prison systems represented have found no need to adopt an exceptionless prohibition against all press interviews of consenting inmates, and a significant number of jurisdictions more or less freely permit them.   The District Court received detailed evidence concerning these prison systems and the success of the open-interview policy [15] and found no substantial reason to suppose that the Bureau of Prisons faces difficulties more severe than those encountered in the jurisdictions that generally allow press interviews.   This

by-case evaluation of interview requests.   These arguments are addressed in Part IV.

[12] These five jurisdictions are California, Connecticut, Kentucky, Virginia, and Wisconsin.

[13] This approach is followed in Alaska, Georgia, Montana, New Jersey, Oregon, Pennsylvania, and South Carolina.

[14] The jurisdictions that generally permit personal interviews are Illinois, Maine, Maryland, Massachusetts, Nebraska, North Carolina, Ohio, Vermont, Iowa, New York City, and the District of Columbia. Additionally, one jurisdiction, New Mexico, follows a unique policy that defies categorization.

[15] The Court received such evidence from penal administrators in Illinois, Massachusetts, New York City, and the District of Columbia.

survey of prevailing practices reinforces the conclusion that the Bureau's prohibition of all prisoner-press interviews is not necessary to the protection of the legitimate governmental interests at stake.

## IV

Finding no necessity for an absolute interview ban, the District Court proceeded to require that interview requests be evaluated on a case-by-case basis and that they be refused only when the conduct of an individual inmate or the conditions prevailing at a particular institution warrant such action. The Court of Appeals affirmed the substance of the order: [16]

> "[W]e . . . require that interviews be denied only where it is the judgment of the administrator directly concerned, based on either the demonstrated behavior of the inmate, or special conditions existing at the

[16] The District Court ordered that the Bureau draft regulations generally permitting press interviews and that exceptions to that policy "be precisely drawn to prohibit an interview only where it can be established as a matter of probability on the basis of actual experience that serious administrative or disciplinary problems are, in the judgment of the prison administrators directly concerned, likely to be directly and immediately caused by the interview because of either the demonstrated behavior of the inmate concerned or special conditions existing at the inmate's institution at the particular time the interview is requested." 357 F. Supp. 779, 784. The Government interpreted this order to require that every denial of an interview request be supported by objective evidence, and argued that such a requirement would invade the proper exercise of discretion by prison administrators and undercut their authority to respond to perceived threats to institutional security and order. Apparently responding to these concerns, the Court of Appeals deleted the references to "likelihood" and "probability" and recast the relevant portion of the order in the language quoted in the text. The thrust of the order remains, however, that prison administrators must decide on an *ad hoc* basis whether to grant each particular request for an interview.

institution at the time the interview is requested, or both, that the interview presents a serious risk of administrative or disciplinary problems." 161 U. S. App. D. C., at 87–88, 494 F. 2d, at 1006–1007.

The Bureau objects to the requirement of individual evaluation of interview requests. It argues that this approach would undermine inmate morale and discipline and occasion severe administrative difficulties. The line between a good-faith denial of an interview for legitimate reasons and a self-interested determination to avoid unfavorable publicity could prove perilously thin. Not unnaturally, prison administrators might tend to allow interviews with cooperative inmates and restrict press access to known critics of institutional policy and management. Denials that were in fact based on an administrator's honest perception of the risk to order and security might be interpreted by some inmates as evidence of bias and discrimination. Additionally, a policy requiring case-by-case evaluation of interview requests could subject the Bureau to widespread litigation of an especially debilitating nature. Unable to rely on a correct application of a general rule or policy authorizing denial, prison officials would be forced to an *ad hoc* defense of the merits of each decision before reviewing courts. In short, the Bureau argues that an individualized approach to press interviews is correctionally unsound and administratively burdensome.

This assessment of the difficulties associated with case-by-case evaluation of interview requests may seem overly pessimistic, but it is not without merit. In any event, this is the considered professional opinion of the responsible administrative authorities. They are entitled to make this judgment, and the courts are bound to respect their decision unless the Constitution commands otherwise. While I agree with the District Court and

the Court of Appeals that the First Amendment requires the Bureau to abandon its absolute ban against press interviews, I do not believe that it compels the adoption of a policy of *ad hoc* balancing of the competing interests involved in each request for an interview.

This conclusion follows from my analysis in Part II, *supra,* of the nature of the constitutional right at issue in this case. The absolute interview ban precludes accurate and effective reporting on prison conditions and inmate grievances and thereby substantially negates the ability of the news media to inform the public on those subjects. Because the interview ban significantly impairs the constitutional interest of the people in a free flow of information and ideas on the conduct of their Government, it is appropriate that the Bureau be put to a heavy burden of justification for that policy. But it does not follow that the Bureau is under the same heavy burden to justify any measure of control over press access to prison inmates. Governmental regulation that has no palpable impact on the underlying right of the public to the information needed to assert ultimate control over the political process is not subject to scrutiny under the First Amendment. Common sense and proper respect for the constitutional commitment of the affairs of state to the Legislative and Executive Branches should deter the Judiciary from chasing the right-of-access rainbows that an advocate's eye can spot in virtually all governmental actions. Governmental regulations should not be policed in the name of a "right to know" unless they significantly affect the societal function of the First Amendment. I therefore believe that a press interview policy that substantially accommodates the public's legitimate interest in a free flow of information and ideas about federal prisons should survive constitutional review. The balance should be struck between the absolute ban of the Bureau and an uninhibited license to interview at will.

Thus, the Bureau could meet its obligation under the First Amendment and protect its legitimate concern for effective penal administration by rules drawn to serve both purposes without undertaking to make an individual evaluation of every interview request. Certainly the Bureau may enforce reasonable time, place, and manner restrictions for press interviews. Such regulations already govern interviews of inmates by attorneys, clergymen, relatives, and friends. Their application to newsmen would present no great problems. To avoid media creation of "big wheels," the Bureau may limit the number of interviews of any given inmate within a specified time period. To minimize the adverse consequences of publicity concerning existing "big wheels," the Bureau may refuse to allow any interviews of a prisoner under temporary disciplinary sanction such as solitary confinement. And, of course, prison administrators should be empowered to suspend all press interviews during periods of institutional emergency. Such regulations would enable the Bureau to safeguard its legitimate interests without incurring the risks associated with administration of a wholly *ad hoc* interview policy.

A similar approach would allay another of the Bureau's principal concerns—the difficulty of determining who constitutes the press. The Bureau correctly points out that "the press" is a vague concept. Any individual who asserts an intention to convey information to others might plausibly claim to perform the function of the news media and insist that he receive the same access to prison inmates made available to accredited reporters. The Bureau is understandably reluctant to assume the responsibility for deciding such questions on a case-by-case basis. Yet the Bureau already grants special mail privileges to members of the news media, and for that purpose it defines the press as follows: "A newspaper entitled to sec-

ond class mailing privileges; a magazine or periodical of general distribution; a national or international news service; a radio or television network or station." Policy Statement 1220.1A, ¶ 4a. This regulation or one less inclusive could serve as an adequate basis for formulating a constitutionally acceptable interview policy. Allowing personal interviews of prison inmates by representatives of the news media, as so defined, would afford substantial opportunity for the public to be informed on the conduct of federal prisons. The fact that some individuals who may desire interviews will not fall within a broad and otherwise reasonable definition of the press should not present any constitutional difficulty.[17]

These comments are not intended to be exhaustive or to dictate correctional policy but only to indicate the broad contours of the approach that I think should be available to the Bureau. I would affirm that portion of the judgment of the District Court as affirmed by the Court of Appeals that invalidates the absolute ban against prisoner-press interviews, but remand the case with instructions to allow the Bureau to devise a new policy in accordance with its own needs and with the guidelines set forth in this opinion.

---

[17] The experience of prison systems that have generally allowed press interviews does not suggest that the Bureau would be flooded with interview requests. If, however, the number of requests were excessive, prison administrators would have to devise some scheme for allocating interviews among media representatives. I have assumed throughout this discussion that priority of request would control, but I do not mean to foreclose other possibilities. It is a fairly common practice for media representatives to form pools that allow many newsmen to participate, either in person or by proxy, in a news event for which press access is limited. The Bureau could certainly cooperate with the news media in the administration of such a program without favoritism or exclusivity to ensure widespread and dependable dissemination of information about our prisons.

## V

The Court's resolution of this case has the virtue of simplicity. Because the Bureau's interview ban does not restrict speech or prohibit publication or impose on the press any special disability, it is not susceptible to constitutional attack. This analysis delineates the outer boundaries of First Amendment concerns with unambiguous clarity. It obviates any need to enter the thicket of a particular factual context in order to determine the effect on First Amendment values of a nondiscriminatory restraint on press access to information. As attractive as this approach may appear, I cannot join it.. I believe that we must look behind bright-line generalities, however sound they may seem in the abstract, and seek the meaning of First Amendment guarantees in light of the underlying realities of a particular environment. Indeed, if we are to preserve First Amendment values amid the complexities of a changing society, we can do no less.