ROBERT P. SMITH, Jr., Acting Chief Judge.
*308 Two newspaper publishers appeal, contesting the Department of Corrections’ Emergency Rule 33ER79-2, adopted July 16,1979. Sections 120.54(9)(a), .68(1), Florida Statutes (1978 Supp.). Commercial Consultants Corp. v. Dept. of Business Regulation, 363 So.2d 1162 (Fla. 1st DCA 1978). We have jurisdiction. Section 120.68(2).
At issue is the adequacy of the Department’s statement of “the specific facts and reasons for finding an immediate danger to the public health, safety, or welfare” justifying an emergency rule. Section 120.-54(9)(a)3. The Department’s justification statement, and the rule itself, are appended to this opinion. The text of the rule, entitled “media interviews with death row inmates”, is:
At the time that a death warrant is issued, all regularly scheduled media interviews with death row offenders are can-celled until after such warrant is executed, expires, or is stayed for a period that will definitely exceed its expiration date.
Specific Authority: 944.23, 922.11, Florida Statutes. Law Implemented: 944.23, 922.11, Florida Statutes. Effective: 7/16/79.
We find the Department has adequately stated “specific facts and reasons” showing a necessity by emergency rule to restrict media interview access to the general death row population, numbering more than 135, during the few days an unexecuted death warrant is outstanding. But the Department’s statement inadequately shows an emergency cause so as to restrict media interview access to particular prisoners whose execution warrants are outstanding, and who consent to interview under procedures afforded by the Department’s permanent rule 33-15.02(l)(c), Fla.Admin. Code. Accordingly, we quash Emergency Rule 33ER79-2 as it applies to persons for whose execution warrants are outstanding, and we otherwise affirm the Department’s emergency action.
Rule 33ER79-2 was adopted three weeks after an identical Emergency Rule 33ER79— 1, adopted June 11, 1979, was on June 26 declared invalid by the District Court of Appeal, Second District, for inadequacy of the Department’s accompanying statement of emergency conditions justifying the rule. Times Publishing Co. v. Florida Dept, of Corrections, 375 So.2d 304 (Fla.2d DCA 1979). In repromulgating the emergency rule the Department substantially expanded its statement of the emergency conditions relied on.
The effect of the emergency rule is to suspend operation of the Department’s permanent Rule 33-15.02(l)(c) during the period of an outstanding execution warrant. The permanent rule provides:
(c) Interviews with prisoners sentenced to death shall be conducted pursuant to administrative guidelines of the Department of Offender Rehabilitation [Corrections], with final interviews permitted on the Wednesday preceding the execution date. Final statements by the condemned offender immediately prior to execution will be authorized at the offender’s option.
The emergency rule does not affect the last sentence of the permanent rule. That is to say: while a death warrant is outstanding, the emergency rule cancels the “regularly scheduled media interviews” granted under permanent Rule 33-15.-02(l)(c) to limited numbers of reporters and death row prisoners on Tuesday, Wednesday, and Thursday of each week;[1] and, in *309 application to prisoners for whose execution a warrant is outstanding, the emergency rule cancels the “final interview” available under the permanent rule on “Wednesday preceding the execution date.” The emergency rule leaves intact the last sentence of permanent Rule 33-15.02(l)(c), authorizing “final statements” by the condemned offender immediately prior to execution at the offender’s option. That remnant of the permanent rule leaves unanswered, and we are not otherwise informed, whether the “final statements” are made orally before witnesses to the execution, including a few reporters attending under another Department rule, or whether the “final statements” are released in another form.- At any rate it is clear that when a warrant.is signed identifying a particular prisoner, among the many, for execution, that prisoner may no longer participate in a préss “interview” as that term is commonly understood. ' X,
Our inquiry here is quite narrow. The publishers make no colorable constitutional claim to a general right of interview access to condemned prisoners. Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Saxbe v. Washington Post Co., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). Nor are we required to decide what access is granted the press by Florida statutes independent or in spite of Department policy. The access claimed by appellants is that which is afforded by the Department’s permanent Rule 33-15.02(l)(c), and their contention is simply that the Department’s justification statement for the emergency suspension of the permanent rule is insufficient under Section 120.54(9)(a), Florida Statutes (1978 Supp.). An immediate appeal of that issue is available,[2] and these publishers have standing to take that appeal. They are “adversely affected” parties.[3] Section 120.68(1).
We reject the Department’s challenge to appellant’s standing based on their failure to request interview access after Emergency Rule 33ER79-2 became effective July 16, 1979, and during the period an execution warrant was outstanding. The Times made such a request less than a month earlier, and was denied access under former Emergency Rule 33ER79-1. Times Publishing Co. v. Florida Dept. of Corrections, supra, 375 So.2d at 304. When the rule was declared invalid, the Department repromulgated it with an expanded justification statement, for no purpose except to cure the defect in its prior action. It is apparent that a further access request by *310 the Times or by any publisher would have been futile.
We find that the Department’s justification statement of the logistical and security conditions in the prison, particularly on death row, is a sufficiently factual statement of “an immediate danger to the public health, safety, or welfare” justifying emergency restrictions on interviews with death row prisoners generally. It is shown that prison security, discipline, and routine programs are disturbed by the imminence of an execution; personnel are taxed with additional duties; the danger to staff and inmates increases. At the same time, “hundreds of requests are received from representatives of the news media, both domestic and foreign, to interview the individual(s) to be executed and all other persons under sentence of death.” Thus reciting its recent experience in prison administration during resumed electrocutions in Florida, the Department demonstrates that it cannot safely and effectively accommodate interview access to this prisoner or that among the general death row population of more than 135. In this respect the emergency condition is sufficiently described; the emergency rule is lawful.
Although the recited security and logistical problems are sufficient to show an “immediate danger” in continued interview access to the numerous prisoners who are not immediately to be executed, the Department’s justification statement does not demonstrate a similar danger in continuing interview access to those prisoners whose death warrants make their execution imminent. Remembering that our task is not to make prison interview policy but to determine whether the Department has shown an “immediate danger” in continuing its own interview policy as stated in permanent Rule 33-15.02(l)(c), we cannot overlook that the permanent rule is merely suspended for a few days in its application to the great number of death row prisoners, while it is abrogated forever in its application to those whose execution warrants are outstanding. Those whose electrocution is imminent are in a class apart from the others, because they are few, and the others are many; because the emergency rule terminates interview access to them at the moment they are identified by the Governor’s warrant; and because the reported interviews of those prisoners are uniquely of interest to a public which continues to debate the morality of capital punishment.
It may be that immediate dangers of an emergency nature attend interviews, under permanent Rule 33-15.02(l)(c), of two or three condemned prisoners whose execution is imminent; but if so those dangers are not shown by the Department’s justification statement which so emphasizes the dangers of handling substantial numbers of prisoners. In emergency rulemaking, especially that emergency rulemaking which effectively cancels rule policy previously adopted after open public debate, Section 120.54(1), an agency is confined to measures which are demonstrably necessary to alleviate the emergency described in its justification statement. Section 120.54(9)(a)2 authorizes emergency rulemaking, provided:
The agency takes only that action necessary to protect the public interest under the emergency procedure.
See also Section 944.23, Florida Statutes (1977).
Having concluded that Emergency Rule 33ER79 — 2 is invalid insofar as it terminates reporter access to prisoners who are willing to participate in interviews and whose death warrants are outstanding, it is appropriate to comment also on the limitations which Chapter 120 imposes on any further Department attempts to define an “emergency” sufficient to suspend permanent Rule 33-15.02(l)(c) in its application to prisoners under warrant of execution. The Department has now failed twice, on June 11 and July 16, 1979, to justify emergency suspension of that rule. Had the emergency rule’s first justification statement been adequate, the rule would expire by operation of law on September 9, 1919[4] While *311 the Department retains emergency rule-making power in respect to the subject of Rule 33ER79-2, the Department cannot'be permitted to extend the effective life of an emergency rule, predicated on a certain emergency, by tacking the life of one invalid emergency rule to the life of another. In a somewhat different context we held, in Postal Colony Co., Inc. v. Askew; 348 So.2d 338, 342 (Fla.1977):
[E]mergency created wholly-by . an agency’s failure to take timely action cannot justify extraordinary suspensions or extensions of the statutory schedule. ■ "
Were we to license further and unrestricted emergency rulemaking on the subject at hand, a further attempt by the Department to cure its justification statement, and to repromulgate the emergency rule, could result in the three rules — 33ER79-1, 33ER79-2, and the third rule — having a combined effective life longer than the original Emergency Rule 33ER79 — 1, effective June 11, would have had if valid. To enforce the restrictions of Section 120.-54(9)(c), supra n. 4, we hold that any further emergency rulemaking, based on emergency conditions perceived or perceivable on June 11,1979, will be effective only until September 9, 1979. Insofar as we hold Emergency Rule 33ER79-2, valid, it too is effective only until September 9, 1979. We do not prohibit further emergency rulemak-ing based on new and substantially different emergency conditions. The Department remains at liberty, as it has been since June 11 and before, to begin “normal rule-making procedures” under Section 120.54. At the time of oral argument, August 2, the Department had not begun “normal rule-making procedures.”
Emergency Rule 33ER79-2 is invalid insofar as it restricts interview access under permanent Rule 33-15.02(l)(c) to death row prisoners for whose execution warrants are outstanding. The rule is otherwise valid. Although a timely petition for rehearing will be entertained, this decision is effective immediately.
AFFIRMED IN PART, REVERSED IN PART.
ERVIN, J., concurs.
BOOTH, J., dissents.

. The Department’s appended justification statement more particularly describes the practice under permanent Rule 33-15.02(l)(c):
(1) Under existing policies, persons under sentence of death incarcerated with the Department of Corrections are normally allowed to meet with representatives of the news media on Tuesday, Wednesday, and Thursday. Due to the available space and security considerations, such interviews are generally limited to meetings between no more than 5 or 6 inmates and 2 to 4 representatives of the news media. Every effort is made to accommodate as many such interviews as possible each [sic]. Adequate alternative means of communication are available. . . .

. Postal Colony Co., Inc. v. Askew, 348 So.2d 338 (Fla. 1st DCA 1977); Times Pub. Cd. v. Florida Dept. of Corrections, supra; Section 120.54(9)(a)3, Florida Statutes (1978 Supp.):
The agency’s findings of immediate- danger, necessity, and procedural fairnesS-.shall be judicially reviewable.

. We do not overlook that Section 120.68(1) requires that appellant be a “party” as well as one “adversely affected.” That reference to the “party” definition in Section 120.52(10) might in other circumstances make it h’ecessdry to inquire whether appellant is one “whose substantial interests will be affected by proposed agency action, and who makep an •appearance as a party” (emphasis added). The appearance required is ordinarily an appearance in the agency proceedings. Here, apparently, there was no such appearance by appellants. Nor was there an opportunity to appear.
In emergency rulemaking an agency may act “by any procedure which is fair under the circumstances and necessary to protect the public interest,” provided it affords “at least the procedural protection given by other statutes” and by the United States and Florida Constitutions. Section 120.54(9)(a)l. The agency’s justification statement must state “its reasons for concluding that the procedure used is fair under the circumstances.” Section 120.54(9)(a)3.
The Department’s appended justification statement describes nothing of the procedure used in adopting the emergency rule, and gives no reason for concluding that the procedure was fair under the circumstances. Appellants do not challenge either the Department’s emergency rulemaking procedures or the Department’s justification of them; conversely, the Department does not claim that appellants lack standing because they made no “appearance” before the agency. This tradeoff makes it unnecessary to decide what opportunity for party appearances must be given in emergency rule-making. See Gadsden State Bank v. Lewis, 348 So.2d 343, 346 (Fla. 1st DCA 1977); “We are unimpressed by the Department’s argument that, because it declined to conduct a formal hearing, there was no occasion for Gadsden to properly ‘appear’ and thus become a party . . .

. Section 120.54(9)(c), Florida Statutes (1977):
An emergency rule adopted under this subsection may not be effective for a period longer than 90 days and shall not be renewable. However, the agency may take identical action by normal rulemaking procedures.