BOOTH, Judge,
Dissenting.
I do not agree with this court’s substitution of its judgment as to the manner in which the Department has chosen to meet what is admittedly an emergency justifying the adoption of the rule in question. The specific reasons for finding an immediate danger to the public health, safety and welfare, are set out in the Department’s statement appended herein. Since this court is not charged with the responsibility of maintaining the security of the prison system and operates without the benefit of the expertise and knowledge of those who are so charged, the emergency rule as adopted by the Department should be affirmed.
APPENDIX
DEPARTMENT OF CORRECTIONS
Rule Number: Chapter 33ER79-2
SPECIFIC REASONS FOR FINDING AN IMMEDIATE DANGER TO THE PUBLIC HEALTH, SAFETY, AND WELFARE:
(1) Under existing policies, persons under sentence of death incarcerated with the Department of Corrections are normally allowed to meet with representatives of the news media on Tuesday, Wednesday, and Thursday. Due to the available space and security considerations, such interviews are generally limited to meetings between no more than 5 or 6 inmates and 2 to 4 representatives of the news media. Every effort is made to accommodate as many such interviews as possible each. Adequate alternative means of communication are available, pursuant to Pell v. Procunier, 417 U.S. 817 [94 S.Ct. 2800, 41 L.Ed.2d 495] (1974), and Saxbe v. The Washington Post, 417 U.S. 843 [94 S.Ct. 2811, 41 L.Ed.2d 514] (1974).
(2) After the Governor signs a death warrant, hundreds of requests are received by the Department of Corrections from representatives of the news media, both domes *312 tic and foreign to interview the individuals) to be executed and all other persons under sentence of death. At the same time, the individual(s) to be executed must be granted lengthier visits with family members, attorneys, and clergy.
(3) Security at institutions is increased during the pendency of a death warrant in order to protect against acts of violence or terrorism by persons outside the prison and to guard against efforts by persons inside and outside the prison to aid the condemned man in an escape effort. All such increased internal security must be accomplished using existing departmental staff.
(4) Whenever an individual under sentence of death is moved from his cell to other points within the prison, general population inmates must be cleared from the area and this results in disruptions of normal prison routine and programs, as well as requiring utilization of correctional officers normally assigned elsewhere. This jeopardizes security in other areas of the prison and thereby endangers the lives of staff and inmates.
(5) It is physically and administratively impossible to arrange large numbers of interviews with persons under sentence of death without jeopardizing the lives of staff and inmates. For example, large numbers of such inmates cannot be brought together in the same room due to their general propensity for violence and their demonstrated propensity to physically harm both correctional staff and other inmates. Several inmates under sentence of death have taken staff hostages and/or attempted to kill other inmates under sentence of death. There is not sufficient space or time to arrange individual interviews in a secure setting.
(6) It is also a security risk to bring large numbers of members of the public into the prison during the time a death warrant is pending. The inmates are tense and the potential for violence is greater during such times.
(7) Based upon the foregoing, the Department of Corrections believes that the security of institutions is jeopardized by any unnecessary visits with persons under sentence of death during the time a death warrant is pending. In order to maintain security, the safety of staff and inmates and continue all other programs to the fullest extent possible under the circumstances, the Department of Corrections believes it appropriate to suspend all news media interviews with all persons under sentence of death during the time a death warrant is pending.
REASONS WHY PROCEDURE USED IS FAIR UNDER CIRCUMSTANCES: The procedures affirmatively provide for interviews by the press of inmates under sentence of death until a point in time where more stringent security measures must be implemented in order to insure security of the prison. A permanent rule will be promulgated in accordance with Chapter 120, Florida Statutes, at which time a public hearing will be held.
SUMMARY: The emergency rule cancels regularly scheduled media interviews with death row inmates from the time that a death warrant is issued until that warrant is executed, expires, or is stayed for a period that will definitely exceed its expiration date.
DATE AND TIME OF EFFECTIVENESS: July 16, 1979.
A COPY OF THE EMERGENCY RULE MAY BE OBTAINED BY WRITING TO: Office of the General Counsel, Department of Corrections, 1311 Winewood Boulevard, Tallahassee, Florida 32301.
EMERGENCY RULE OF THE DEPARTMENT OF CORRECTIONS
33ER79 — 2 MEDIA INTERVIEWS WITH DEATH ROW INMATES
(1) At the time that a death warrant is issued, all regularly scheduled media interviews with death row offenders are can-celled until after such warrant is executed, expires, or is stayed for a period that will definitely exceed its expiration date.
Specific Authority: 944.23, 922.11, Florida Statutes. Law Implemented: 944.23, 922.-11, Florida Statutes. Effective: 7/16/79.