**UNITED STATES of America**

**v.**

**Richard HUSS, Defendant.**

**UNITED STATES of America**

**v.**

**Jeffrey H. SMILOW, Defendant.**

**Nos. 73 Cr. Misc. 25, 73 Cr. Misc. 24.**

United States District Court,
S. D. New York.

May 5, 1975.

Supplemental Opinion May 14, 1975.

Jerry L. Siegel, Asst. U. S. Atty., New York City, for plaintiff.

Nathan Lewin, Miller Cassidy Larroca & Lewin, Washington, D. C., for defendant.

## OPINION

GRIESA, District Judge.

This proceeding arises out of the conviction of the defendants for criminal contempt and the sentence of each of them to imprisonment for one year pursuant to such conviction.

Defendants apply for an order directing the Bureau of Prisons to make available during the period of their incarceration, Kosher food meeting the requirements of Orthodox Jewish dietary laws. Defendants rely upon the First and Eighth Amendments to the Constitution, guaranteeing the free exercise of religion and prohibiting cruel and unusual punishments.

For the reasons hereafter set forth, I have concluded that defendants have no constitutional right to be provided with Kosher food during their imprisonment. The application is denied.

## I.

The proceedings leading up to the convictions for criminal contempt are described in two opinions of the Court of Appeals,—Smilow v. United States, 465 F.2d 802 (2d Cir. 1972); and United States v. Huss, 482 F.2d 38 (2d Cir. 1973). Further details are contained in my unpublished opinion dated May 6, 1974 in United States v. Huss and Smilow (73 Cr.Misc. 25 and 24).

Basically, the genesis of the matter was the bombing on January 26, 1972 of the New York City offices of Columbia Artists Management, Inc., and the offices of impresario Sol Hurok. One person was killed at the Hurok office as a result of what Chief Judge Kaufman of this circuit has properly described as "senseless and cowardly acts of violence". 482 F.2d at 39.

In order to prosecute at least some of the perpetrators of these deeds, the government found it necessary to grant immunity to Huss and Smilow to obtain their testimony in a criminal action brought against Stuart Cohen, Sheldon Davis and Jerome Zellerkraut. However, Huss and Smilow refused to testify on religious and other grounds. Their contentions were definitively rejected by the Court of Appeals in the two opinions referred to above. In spite of these rulings by the Court of Appeals, Huss and Smilow continued their refusal to testify in the criminal action. As a result, the

government's efforts to prosecute the case were effectively nullified. The criminal contempt proceedings against Huss and Smilow resulted.

Huss and Smilow were found guilty of criminal contempt by a jury on July 16, 1974. On July 31, 1974 they were each sentenced to imprisonment for one year. The convictions were affirmed without opinion by the Court of Appeals on November 27, 1974. Defendants commenced serving their sentences on April 4, 1975.

Defendants are presently incarcerated at the West Street Detention Center in New York City. They have been designated to serve the balance of their sentence, following the present proceedings, at the Federal Youth Center, Ashland, Kentucky.

## II.

■ The question with respect to defendant Huss's asserted constitutional right to Kosher food can be dealt with quickly. By his own testimony, he is simply not an observer of the Kosher dietary requirements.

The situation is different as to defendant Smilow, who has testified that he is an Orthodox Jew and is indeed an observer of the Kosher rules. Under these circumstances, the question of Smilow's right to be provided with Kosher food must be examined in some detail.

## III.

A learned Orthodox Jewish Rabbi, Joseph H. Ralbag, testified in this matter, and was of great assistance to the court. The following findings regarding the Kosher rules and other questions of Jewish law are based largely on Rabbi Ralbag's testimony.

The Kosher rules have their origin in certain passages of the Bible. Leviticus 11 and Deuteronomy 14 provide that certain "clean" meats, such as lamb and beef, may be eaten. But there is a list of certain animals, fowl and water life which are "unclean" and cannot be eaten. Of the unclean meat, the most familiar in the present day is anything derived from the hog.

The Bible is also the source of certain other requirements, including provisions about salting and removal of blood (Deut. 12, 16 and 23–25); the removal of a certain nerve or sinew, based upon the incident of Jacob and the angel (Gen. 32:32); and the prohibition upon cooking or eating meat with milk. The latter provision stems from a Biblical passage which forbids seething a kid in the mother's milk (Ex. 23:19 and 34:26; Deut. 14:21).

There are certain requirements that Kosher meats be free of blemishes. For this and other reasons there is a need to have Rabbinical supervision and inspection of the process of preparation of Kosher meat.

It appears that there is no prohibition against eating the common fruits and vegetables. However, one of the Kosher requirements forbids the cooking of anything—including fruits and vegetables—in vessels which have been used for the cooking of unclean food. Thus a pot or a pan which had been used in cooking with pork or lard could not be used for cooking fruits or vegetables unless properly purified.

The same requirement would be applicable to the vessels used for cooking "clean" meats such as beef or lamb.

There is no prohibition against the use of cow's milk or butter. However, cheese apparently is required to be prepared under Kosher rules to avoid the use of improper additives.

Further elaboration of the dietary rules is contained in the Talmud, which was completed in about the sixth century A.D., and in a later codification known as the Code of Jewish Law.

The dietary laws are, of course, only a part of the great body of Jewish law concerning religious and moral subjects. In addition, as originally set forth in the Bible, there was a substantial body of civil and criminal laws.

Obviously, some of these rules and laws are of greater importance than others. An indication of this is provided by the range of penalties specified in the Biblical codes of law. The death penalty was provided for murder and other serious offenses. It is interesting to note that the Deuteronomic Code deals with an offense such as the one committed in the present case by Huss and Smilow—i. e., failure to obey the order of a duly constituted court. This offense was deemed serious enough for imposition of the death penalty (Deut. 17:9–12).

On the other hand, there appears to be no specific penalty provided for violation of the dietary laws.[1]

This venerable system of Jewish laws, with its scale of penalties,[2] is of significance in helping us place the dietary rules in some perspective. Clearly, the need to enforce the essential criminal laws was of prime importance to the Hebrew lawgivers, just as it is in today's society.

### IV.

Rabbi Ralbag testified as to the underlying meaning and purpose of the Jewish dietary rules. He testified that the Jewish religion recognizes two basic types of responsibilities imposed on the individual—responsibilities to God and responsibilities to fellowmen. Included in the responsibilities to fellowmen is the duty to observe the law of the land.

An important element of carrying out these responsibilities is the discipline of the individual. It is here, according to Rabbi Ralbag, that the dietary laws have significance. The purpose of these laws is to impose a discipline on the individual character. Kosher observance leads to the fashioning of the character of a man.

There is no formal penalty for nonobservance of the dietary laws. According to Jewish belief, compliance with these rules, as well as other phases of the Jewish religious law, affects the moral and spiritual character of the individual, which ultimately determines his well-being and salvation.

As to other phases of religious observance, an Orthodox Jew worships three times a day—praying in the morning, at midday and in the evening. Grace is recited before each meal. Religious services, consisting of prayers, and on some occasions a sermon, take place on Friday evening and Saturday of each week. In addition, there are special religious services and other observances on the Jewish holidays.

### V.

The Bureau of Prisons has promulgated guidelines relating to religious beliefs and practices of federal prisoners. These guidelines provide that it is the policy of the Bureau to extend to prisoners the greatest amount of freedom and opportunity for pursuing individual religious beliefs, consistent with the requirements of maintaining security, safety and orderly conditions in the institution. In carrying out this policy the Bureau employs chaplains on a full-time or part-time basis, depending upon the size of the institution and the number of prisoners of a particular faith. In addition, volunteer clergymen or other persons are permitted to enter the prisons to hold religious services, give religious instruction, and provide counseling, when there is a demand for such activities on the part of inmates.

---

1. Rabbi Ralbag indicated that the general punishment of up to 39 stripes for the violation of "negative commandments" might have applied under the ancient codes of law. But the only Biblical reference to 39 stripes does not seem to apply to dietary laws (Deut. 23:1–3).

2. Rabbi Ralbag testified that it is doubtful whether the harsher features of the law were ever carried out to any substantial extent, and that in any event they have long since disappeared for humane and other reasons.

Prisoners may have for their personal use Scriptural or other devotional books. A Jewish prisoner may have phylacteries and other liturgical apparel for his use in prayer.

Defendant Smilow has testified that during his incarceration at West Street in New York City, he has carried out his prayers three times daily. There is a part-time Jewish chaplain at West Street. At present, no Jewish religious services are being held at West Street because the Jewish chaplain believes that the number of Jewish prisoners is insufficient to hold such services. However, at less transient prison facilities, such as Danbury, Jewish religious services are regularly held. In any event, the Bureau of Prisons places no impediment to the holding of such services.

The Bureau of Prisons guidelines regarding religion contain the following provision regarding diet. Among other things, it is provided that a federal prisoner may abstain from eating food which is prohibited by his religion, and he may receive added portions of that prison food which does not violate his beliefs.[3]

"(1) A committed offender may abstain from eating those food items, served to the general population, which are prohibited by the religion of the resident. The committed offender may receive added portions of non-rationed food items, from the main serving line, which in no way cause a violation of the restrictions of the faith professed by the committed offender. Ordinarily, the practical problems of institutional administration must be primary in arranging for the observance of religious holidays, sacraments, celebrations, diets, and the like.

"(2) The staff Chaplains, after consultation with the Warden, shall anticipate and arrange for the opportunities for the celebration of the rit-

uals of a sacramental nature which are necessary to meet the minimal annual requirements of a given religious faith. Food requirements shall be met through the announced and offered menu of the main serving line. Sacramental elements may be arranged for, appropriately and within reason, through conversations between a staff Chaplain, the Warden, and a community representative of the involved faith group. Symbolic or sacramental elements may be purchased with funds from the regular food service budget, if the food is a part of the main serving line, or may be purchased with funds from the budget of religious activities, if the food cannot be made a part of the main serving line. So that sacramental observances may be held, arrangements may be made for special times of worship or especially suitable places of worship in keeping with the safe and orderly conduct of the institution."

The evidence indicates that a special group meal is served, where possible, to Jewish prisoners at Passover, and to Black Muslim prisoners at Ramadan. The way this is done is apparently somewhat flexible. At Danbury, for instance, the Passover meal is prepared by Jewish prisoners serving in the kitchen, and consists of many of the same food items served to the other prisoners that same meal.

At the West Street Detention Center in New York City, frozen Kosher meals were brought in for several days during the Passover season this year. The extra cost, over and above the regular allotment, was apparently paid for by the local Board of Rabbis.

VI.

With regard to prison food in general, Congress appropriates a specific annual amount for the care of prisoners, covering food, medical supplies and clothing.

---

3. Application of this provision in the case of an Orthodox Jew is discussed in Part IX of this opinion.

Based on experience, the Bureau of Prisons decides how much money can be spent on food at a particular institution. The objective is to furnish essentially the same quantity and quality of food at all institutions. However, the costs of food at particular locations may vary because of local conditions.

The average amount of money spent on food for federal prisoners throughout the country during the first three quarters of fiscal 1975 has been $1.38 per man per day. The amount spent at Ashland has been $1.85.

These figures can be compared with the cost of feeding armed services personnel, which averages about $3.00 per man per day. The average cost of feeding a patient in the Veterans Administration Hospital in Washington, D. C., is about $2.60 per man per day.

The prison menus are planned by the local institution staff, subject to central review by the Bureau of Prisons. These menus are designed to meet nutritional requirements. At the same time, of course, the cost must come within the strict budgetary limitations.

### VII.

Defendants introduced into evidence a letter dated July 9, 1973 from Norman A. Carlson, Director of the Bureau of Prisons, to Senator Burdick. This letter summarized the main objections on the part of the Bureau to the service of Kosher food. The letter stated in part:

"The serving of kosher food in an institution is a very complex problem. This would require separate preparation and serving facilities, equipment, utensils, dinnerware, menus, subsistence and sources of supply and specially trained staff. The cost of such an operation would be prohibitive, since in effect we would have to establish two totally separate, independent food operations in every institution where a requirement for kosher food was found. Depending on the location of the institution, the procurement of kosher food is estimated to cost two to three times our present food cost.

"Perhaps the greatest problem in the serving of kosher food would be the precedent established. If the dietary rules of one religion or belief are recognized to this extent it would be most difficult not to similarly recognize the food preferences of all religions. It appears doubtful if any food service operation could cope with such a diversified presentation."

In the present proceeding, defendants make no real challenge to the statements of Mr. Carlson regarding the impracticability of a prison preparing Kosher food for Orthodox Jewish prisoners.

The actual proposal of defendants is to require the Bureau of Prisons to bring in frozen Kosher meals, or frozen packages consisting of the main elements of the noonday and evening meals —meat and vegetables. The further proposal is that, since such frozen meals are readily available in New York City, defendants should be permitted to serve their sentences here, rather than being transferred to Ashland, Kentucky, where Kosher food, including Kosher frozen meals, may not be so accessible.

The Bureau of Prisons takes the position (1) that it should not be compelled to provide Kosher frozen meals at *any* of its prison facilities, including New York City; and (2) that the Bureau assigns prisoners to a particular institution based on essential considerations such as age, type of crime, and extent of prior criminal record, and the Bureau's discretion in this matter should not be interfered with.

### VIII.

In the interest of the individual prisoner, and in the public interest, the Bureau of Prisons attempts, as much as possible, to avoid housing young and inexperienced offenders with sophisticated criminals. Defendant Huss is 19 years old, and defendant Smilow is 20 years old. Prior to the events in question in this case, neither of these defendants

had any criminal involvement. Basically for these reasons, the Bureau of Prisons determined that defendants should serve their sentences at the Federal Youth Center, Ashland, Kentucky. There are two other similar facilities in the federal prison system—at Pleasanton, California, and at Englewood, Colorado.

The record indicates that frozen Kosher packages—consisting of a meat and two vegetables—can be obtained from a supplier in Huntington, West Virginia, which is about 25 miles from Ashland. However, the cost of these packages is between $2.50 and $3.50. Since the average cost of a serving of meat and vegetables at the Ashland facility is 30¢, the cost of the frozen Kosher packages would be about ten times greater.

It appears that frozen Kosher food packages were obtained on a trial basis for two Orthodox Jewish prisoners for several months in early 1974 at the West Street Detention Center in New York City. Each package contained meat and two vegetables. The cost was $4.00 per package, which was apparently a reduction from the normal price of $4.50 or $5.00.

In addition to the problem of the high cost of this Kosher food, it appears that during the time the food was being served to the second prisoner, six militant Black Muslim inmates surrounded the prison food administrator in a threatening manner agitating to be provided with special food required by their religion.[4]

In any event, the Bureau of Prisons has decided that it is not sound policy for it to provide special foods, whether in frozen packages or otherwise, to any religious group on a regular basis. The Bureau points to the obvious fact that above average expenditures of money for one group of prisoners will reduce what can be spent for the rest of the prisoners.

It is true that the actual amount of money which would be necessary to provide Kosher frozen meals to Orthodox Jewish prisoners would be quite small in view of the fewness of such prisoners.[5] However, the Bureau urges that if one religious group is granted special food on a regular basis, others would demand to be similarly treated, and the problem would become one of major proportions. An example of a more numerous group with special religious dietary demands is the Black Muslims. Judicial decisions dealing with Black Muslim dietary problems in prison will be discussed hereafter.

Defendants seek to eliminate the problem of disproportionate spending by asserting that the extra cost of Kosher frozen foods would be paid by an Orthodox Jewish organization. The Bureau of Prisons argues that this is totally unsatisfactory, and that the idea of prisoners being able to pay for their own special and more expensive food is repugnant to prison discipline.

The Bureau of Prisons asserts that there is great sensitivity in a prison atmosphere to special treatment of any kind given to particular prisoners. Such special treatment has the potential of causing hostility and harm to the favored ones, as well as causing discipline problems to the prison as a whole.

The Bureau of Prisons takes care to have the same basic religious opportunities available to all prisoners. For instance, if the Jewish prisoners are permitted a group meal at Passover, the institution offers the same opportunity to the Black Muslims in connection with Ramadan.

It should be noted that the Bureau of Prisons draws a sharp distinction be-

4. The second prisoner apparently may have had personality problems that aggravated the situation. But the example nevertheless illustrates the point that in a volatile prison atmosphere differences in treatment are inevitably potential sources of danger.

5. Defendants' attorney estimates that there are less than a dozen—perhaps less than six —observant Orthodox Jews in the federal prison system at present.

tween *occasionally* allowing a special meal and the *regular* provision of special food to one or more religious groups.

In addition to the problems referred to above, the Bureau asserts that a security problem would be created by having separate food brought in for particular groups. According to the Bureau, if items purchased by the prison are known to be destined to a particular prisoner or group of prisoners, this provides a favorable opportunity for the importation of contraband to that prisoner or group.

### IX.

Earlier in this opinion I referred to the Bureau of Prisons guideline specifying that a federal prisoner may abstain from eating food which is prohibited by his religion, and he may receive added portions of that food which does not violate his religious beliefs. There are some obvious difficulties in carrying this out with respect to an Orthodox Jew and his Kosher dietary requirements. The problem is that the strictly obedient Orthodox Jew not only eschews pork and pork products but is also unwilling to eat other meats, as well as fish and poultry, unless he is certain that they have been prepared in pots or pans that have not been used with pork products. The same problem exists with respect to cooked vegetables, cooked fruits, and pastries such as cakes and pies. These strict prohibitions were testified to by Rabbi Ralbag.

This does not mean that an Orthodox Jewish prisoner is without food. He can eat fresh vegetables, fresh fruits, canned fruit, dry cereal, milk, bread and butter, coffee, and ice cream. He can also eat hard boiled eggs and canned fish, such as sardines.[6] His main problem relates to sufficient cooked food. In this regard, the record indicates that an adequate supply of cooked vegetables, together with milk, bread and the other items just described, would provide an adequate diet.[7]

During periods of incarceration at the West Street Detention Center in 1972 and 1973 in connection with the civil contempt proceedings, Smilow solved the cooked food problem to some extent by simply eating the cooked vegetables provided to the inmates. He also would find out from the cook about the preparation of cakes, and would occasionally eat one of these.[8] During his present incarceration, Smilow has adopted a stricter stance, and apparently refuses to eat any cooked food from the general serving line.

The evidence in this proceeding indicates that the federal prison officials, now that they have rejected the proposal of furnishing frozen Kosher food to inmates, nevertheless do whatever they can, by the use of their regular food supplies and facilities, to assist an Orthodox Jew in abiding by his dietary laws. Thus, they are willing to assign such a prisoner to kitchen duty so that he may obtain extra foods of the kind not forbidden, and so that he may cook in special containers. This works on a rather impromptu basis, because of the rarity of a strict Orthodox Jew in the prison system. However, the important point is that the prison officials have

---

6. A nutritionist called by defendants testified that a diet consisting of dry cereal, milk, bread and butter, fruit, salad vegetables, and coffee would be inadequate, lacking necessary proteins, vitamins and minerals. According to the nutritionist, a supplement of hard boiled eggs and canned sardines would improve the diet, although too many eggs can create cholesterol problems. This supplemented diet would probably satisfy protein requirements, but might leave some deficiencies in vitamins and minerals.

7. Defendants' nutritionist testified that legumes in combination with certain starches provide proteins, and certain vegetables, as well as egg yolks, are good sources of minerals.

8. It appears also that toward the end of his 1973 incarceration, Smilow was provided with frozen Kosher packages.

demonstrated a willingness to afford an Orthodox Jew every reasonable assistance in obtaining adequate food within his religious laws. The evidence indicates that this assistance would go to the extent of making vitamin and mineral pills available in the event of a discernible medical need.

## X.

█ In a non-prison setting, it is clear that a citizen's right to the free exercise of his religion under the First Amendment can be limited by governmental activity only where the government demonstrates (a) that the limitation is justified by a compelling governmental interest, and (b) that no alternative forms of regulation would suffice. Sherbert v. Verner, 374 U.S. 398, 403–7, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

██ However, lawful incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system". Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). A prison inmate retains only those First Amendment rights which are not inconsistent with his status as a prisoner and with the legitimate penological objectives of the corrections system. Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). In general, matters of security and prison administrative problems are within the province and professional expertise of corrections officials, and courts should ordinarily defer to their expert judgment in such matters. *Id.* at 826–27, 94 S.Ct. 2800.

In the context of religious observance the Court of Appeals for this circuit has stated in Sostre v. McGinnes, 334 F.2d 906 (2d Cir. 1964), cert. denied, 397 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964):

"But before we reach the question of equality of treatment, we should point out that the practice of *any* religion, however orthodox its beliefs and however accepted its practices, is subject to strict supervision and extensive limitations in a prison. The principal problem of prison administration is the maintenance of discipline. . . . No romantic or sentimental view of constitutional rights or of religion should induce a court to interfere with the necessary disciplinary regime established by the prison officials." 334 F.2d at 908.

It is true, of course, that the courts have intervened on occasion to protect religious rights of prisoners. For example, the Supreme Court reversed a lower court's denial of a hearing in a suit where a state prisoner alleged that, because of his particular faith, he was denied virtually all means of worship, and was not accorded privileges granted to adherents of other religions. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). See also Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), and 382 F.2d 518 (7th Cir. 1967); Pierce v. La Vallee, 293 F.2d 233 (2d Cir. 1961). However, the Court of Appeals of this circuit has made it clear that judicial intervention in connection with the asserted religious rights of prisoners is "subject to extensive limitations which would not be applicable were the plaintiffs not prisoners". Sostre v. McGinnes, 334 F.2d at 908. Indeed, in Cruz v. Beto, *supra,* the Supreme Court stated that federal courts "sit not to supervise prisons" and,

"We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations." 405 U.S. at 321, 92 S.Ct. at 1081.

There appears to be no reported judicial decision dealing with a request by an Orthodox Jew to be provided with Kosher food in prison. However, there have been several cases relating to Black

Muslim prisoners and their dietary laws. The latter rules are similar to the Kosher laws in forbidding the eating of pork or pork products. But the Kosher rules, when strictly observed, appear to be more stringent than the Black Muslim rules, because of the problem under the Kosher rules about not eating even "clean" foods if cooked in pots or pans that have been used for pork products and not purified.

In dealing with the decisions about the Black Muslims, it should be noted at the outset that, despite the statement of rather broad theories in certain of the decisions, there appears to be no reported case in which a prison has been required to provide Black Muslims with special food.

Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969), dealt with an application by Black Muslim inmates of the District of Columbia jail for provision of one pork-free meal per day. The majority opinion (Robinson and McGowan, C. JJ.), over the strong dissent of Judge Tamm, held that the prison authorities were required to meet the "compelling state interest" test with respect to their alleged infringement of the religious rights of the Black Muslims in regard to diet. The case was remanded to the District Court for a hearing. Upon remand, judgment was entered in favor of the prison superintendent (Unreported decisions H.C. 174–66 and H.C. 66–66 (D.C.D.C. July 14, 1969)).

Another case which adopted the "compelling state interest" test in regard to alleged infringement of Black Muslim dietary requirements was Ross v. Blackledge, 477 F.2d 616 (4th Cir. 1973). The court held that the burden was on the prison officials to clearly demonstrate that an adequate ration was available to the Muslim prisoners wishing to observe their religious creed. The case was remanded for further proceedings in the District Court. I have not been furnished with any record of the results of that District Court proceeding.

It should be noted that previous Fourth Circuit cases did not apply the compelling state interest test, and rejected claims of Black Muslim prisoners to be entitled to special food. Abernathy v. Cunningham, 393 F.2d 775 (4th Cir. 1968); Childs v. Pegelow, 321 F.2d 487 (4th Cir. 1963), cert. denied, 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964).

Walker v. Blackwell, 411 F.2d 23 (5th Cir. 1969), was a mandamus proceeding seeking to compel the federal penitentiary in Atlanta to serve a special diet after sunset during the month of December —the Ramadan period of the Black Muslim religion. The court held that the authorities were required to demonstrate a compelling and substantial public interest in refusing this request, and went on to hold that this burden had been met by a showing with regard to extra expense and other administrative problems.

Battle v. Anderson, 376 F.Supp. 402 (E.D.Okl.1974), was a case involving numerous claims of abuse and discrimination directed at Black Muslim prisoners. The court found that even the regular food (including pork) served to the prisoners was deficient. The court held that the prison authorities had offered no justification to support their "food distribution practices" which prevented the Muslim inmates from abstaining from the consumption of pork. However, the relief granted by the court was limited to a direction to the prison to label the pork items as such, so that they could be avoided by the Muslim inmates.

I now turn to the question of what the proper constitutional standard should be in the present case in resolving the request to have Kosher food furnished to defendants during their incarceration in a federal prison. The above cases, of course, show that certain circuits hold that the prison authorities must demonstrate a compelling governmental interest to justify failure to meet religious dietary demands of groups of prisoners. This is the same constitu-

tional standard which is applied with respect to the First Amendment rights of nonprisoners. It is my conclusion that such a rule is contrary to the decisions of the Supreme Court and of the Second Circuit, as well as certain decisions in other circuits.

It is clear from Pell v. Procunier, *supra,* and from Sostre v. McGinnes, *supra,* that a prisoner's First Amendment rights are severely curtailed simply by virtue of the fact of imprisonment. I read the Supreme Court and Second Circuit decisions as holding that, in order for a prisoner to successfully challenge prison procedures on First Amendment grounds, he has the burden of showing that the procedure or practice in question is clearly unreasonable; and in this inquiry the expert judgment of the prison officials is accorded substantial deference. This would seem to be particularly true in regard to the basic matters involved in prison administration such as the feeding, housing and disciplining of prisoners. See Wilson v. Prasse, 463 F.2d 109 (3rd Cir. 1972); Long v. Parker, 390 F.2d 816 (3rd Cir. 1968); Childs v. Pegelow, *supra;* X. (Bryant) v. Carlson, 363 F.Supp. 928 (E.D.Ill. 1973).

■ Applying what I believe to be the controlling Supreme Court and Second Circuit authorities, and other decisions in harmony therewith, I have no doubt that defendants in the present action have failed to show that they are constitutionally entitled to be supplied with Kosher food during their imprisonment. In my view, the Bureau of Prisons is entirely correct in refusing to purchase special food for one group of prisoners, which is distinctive in quality and far more expensive than the food issued to prisoners in general. It is clear that this cannot be done for one group without making the same provision for other groups who demand their special privileges. I am also persuaded that it would be contrary to good order and discipline to permit one group of prisoners, or organizations supporting them, to pay for their more expensive, special food. In addition, the security problems referred to by the Bureau of Prisons cannot be overlooked.

■ Since I am holding that the Bureau of Prisons is not required to provide special Kosher food in New York City, any more than it is in Ashland, Kentucky, there would be no purpose served in following defendants' suggestion that the Bureau of Prisons be ordered to assign defendants to the facility in New York City, where Kosher frozen food is allegedly more readily available than in Ashland, Kentucky. In any event, it appears that this court lacks authority to designate the place of incarceration, since this decision is entrusted by statute to the Attorney General. 18 U.S.C. § 4082; Hamilton v. Salter, 361 F.2d 579, 581 (4th Cir. 1966).

*Conclusion*

Defendants' application for an order directing the Bureau of Prisons to provide them with meals meeting the Orthodox Jewish Kosher dietary laws is denied.

So ordered.

SUPPLEMENTAL OPINION

In a memorandum filed May 9, 1975, the government requests an amendment to my opinion of May 5, 1975. In that opinion I denied defendants' request for an order directing the Bureau of Prisons to serve them Kosher food. In the course of that opinion I stated:

"I read the Supreme Court and Second Circuit decisions as holding that, in order for a prisoner to successfully challenge prison procedures on First Amendment grounds, he has the burden of showing that the procedure or practice in question is clearly unreasonable; and in this inquiry the expert judgment of the prison officials is accorded substantial deference. This would seem to be particularly true in regard to the basic matters in-

volved in prison administration such as the feeding, housing and disciplining of prisoners."

I went on to hold that defendants had failed to show that they are constitutionally entitled to be supplied with Kosher food during their imprisonment.

The government now argues that the statement quoted above goes too far in favor of the government, and is not in harmony with the Supreme Court decision in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), a decision not heretofore referred to by the parties. The government urges that once a prisoner has shown that a prison policy or regulation interferes with the exercise of his religion, the burden is then placed upon the prison authorities to show that the policy or regulation furthers a substantial governmental interest connected with the legitimate goals of the correction system, unrelated to the suppression of religion, and must further show that the limitation on religious exercise is not greater than is necessary or essential to the protection of the particular governmental interest involved. The government further asserts that, in the present case, the government has fully met its burden of proof as properly defined and is entitled to a finding to that effect from this court.

One thing which the government's latest brief illustrates is the difficulty of stating any general rule about burden of proof in cases involving prisoners' claims of violation of First Amendment rights. The Supreme Court decision in Procunier v. Martinez, while highly instructive, is somewhat narrower than the government indicates. The case deals solely with the censorship of prisoner mail. The Court emphasized that this problem involves not only the rights of prisoners, but also the First Amendment rights of *nonprisoner* correspondents (416 U.S. at 408, 94 S.Ct. 1800). In this context, the Court held that prison officials who censor mail must show that such censorship furthers one or more of the substantial governmental interests of security, order and rehabilitation, and must further show that the limitation of First Amendment freedoms is not greater than is necessary or essential to the protection of the governmental interest involved. In other words, the officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements (416 U.S. at 413, 94 S.Ct. 1800). It is interesting to note, however, that the Court went on to state that prison officials are not required to show *with certainty* the adverse consequences from failure to censor, but that there must be some latitude given for anticipating probable consequences of allowing certain speech in a prison environment (416 U.S. at 414, 94 S.Ct. 1800). In *Martinez* the Court affirmed a three-judge district court ruling partially invalidating certain California prison mail censorship regulations.

Does the formulation of Procunier v. Martinez apply in the present case—where the claim is that, despite the provision of adequate food to all prisoners equally, there is nevertheless a violation of defendants' First Amendment rights because special food is not provided to enable them to fully comply with their particular religious beliefs? A Supreme Court decision more closely in point for the present case than *Martinez* is Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). There the Court upheld certain California regulations prohibiting face-to-face interviews between press representatives and individual inmates whom the press specifically requested to interview. The decision did not expressly discuss the burden of proof problem. But after citing *Martinez*, the decision quickly found that it is legitimate to provide some non-discriminatory limitations upon the right of outsiders to have access to inmates. The Court went on to state that the relevant considerations

". . . are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." (417 U.S. at 827, 94 S.Ct. at 2806).

Finally, the Court held that the restriction imposed by the California authorities had not been shown to be unconstitutional (417 U.S. at 827–28, 94 S.Ct. 2800).

 In the present case, defendants have not asserted that the Bureau of Prisons discriminates against their faith, or restricts in any way the carrying out of strictly religious observances such as prayer, or worship services. Defendants' claim relates, of course, to food. From the standpoint of an Orthodox Jew, food has a religious significance. But from the standpoint of the prison officials, food is one of the most basic and essential subjects of prison administration. The Bureau of Prisons has come forward in the present case with an explanation as to the reason the Bureau declines to provide Kosher food to Orthodox Jewish inmates. These considerations are described in some detail in my opinion of May 5, 1975. As stated in that opinion, I am convinced that the Bureau is amply justified for reasons of sound administration, order, discipline and security in refusing to provide special, more expensive food to one group of prisoners on a regular basis. This is particularly true in view of the fact that the Bureau makes reasonable efforts to permit an Orthodox Jewish prisoner to supplement his diet from regular prison foods which do not violate the Kosher dietary laws. As was the case in Pell v. Procunier, I believe that here the relevant considerations are peculiarly within the province and expertise of the correctional officials, and that in the absence of substantial evidence in the record to indicate that the officials have "exaggerated their response", I am of the opinion that this court should defer to the judgment of these officials. I further hold that no showing has been made by defendants to indicate that the Bureau of Prisons has acted on the matters in question in an exaggerated or unconstitutional manner.

In this connection, I note the admonition of the Supreme Court in Saxbe v. Washington Post, Inc., 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974), a case decided the same day as Pell v. Procunier. In *Saxbe* the Court cited with approval testimony by the Director of the Federal Bureau of Prisons that "one of the very basic tenets of sound correctional administration" is "to treat all inmates incarcerated in [the] institutions, as far as possible, equally". The Supreme Court stated that this expert and professional judgment is entitled to great deference (417 U.S. at 849, 94 S. Ct. 2811).